UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRIAN T. BARRETT,

                                        Plaintiff,

                                                            Case # 14-CV-6593-FPG
v.
                                                            DECISION AND ORDER

LIVINGSTON COUNTY, NEW YORK, et al.,

                                        Defendants.

## INTRODUCTION

Plaintiff Brian T. Barrett brings this civil-rights action against Defendants Livingston County, Thomas J. Dougherty, Randall S. Newton, Jason A. Yasso, Michael Shepard, Gail Yunker, Anne Schinski, Heather Braaten, and Dr. Richard F. Aguirre.  ECF No. 49.  His claims, which arose during his time confined at the Livingston County Jail, relate to allegedly inadequate medical treatment he received as well as an incident of excessive force.  *Id.*  Before the Court are two summary judgment motions: one filed by Dr. Aguirre and one filed by the remaining defendants (the "County Defendants").  Barrett opposes the motions.  For the following reasons, Dr. Aguirre's motion (ECF No. 71) is GRANTED, and the County Defendants' motion (ECF No. 76) is GRANTED IN PART and DENIED IN PART.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the

non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

Because Barrett's claims are largely distinct from one another, the Court will set forth the relevant facts in the course of analyzing each claim. Unless otherwise noted, those factual descriptions consist of the undisputed facts and the disputed facts taken in the light most favorable to Barrett. *See Smolen v. Wilkinson*, No. 11-CV-6001, 2013 WL 5417099, at *1 (W.D.N.Y. Sept. 26, 2013).

Barrett brought this action in October 2014. He now raises five claims—

(1) a § 1983 claim for deliberate indifference to his medical needs (knee condition),[1] alleging that:

    a. Defendants Dr. Aguirre, Nurse Schinski, Nurse Braaten, Nurse Yunker, Sheriff Dougherty, Chief Deputy Yasso, and Livingston County are directly liable; and
    b. Defendants Livingston County, Chief Deputy Yasso, Dr. Aguirre, and Sheriff Dougherty are liable in their supervisory capacities.

(2) a § 1983 claim for deliberate indifference to mental-health needs (risk of suicide/self-harm), alleging that:

    a. Defendants Nurse Schinski, Sheriff Dougherty, Chief Deputy Yasso, Corporal Newton, and Livingston County are directly liable; and
    b. Defendants Livingston County, Chief Deputy Yasso, and Sheriff Dougherty are liable in their supervisory capacities.

(3) a § 1983 claim for failing to protect him from the risk of suicide, alleging that:

---

[1] "42 U.S.C. § 1983 allows a plaintiff to sue when he or she is injured by the violation of the United States Constitution or federal law by a state or local official." *Palacio v. City of New York*, 489 F. Supp. 2d 335, 338 n.1 (S.D.N.Y. 2007).

<ol type="a">
<li>Defendants Nurse Schinski, Sheriff Dougherty, Chief Deputy Yasso, Corporal Newton, and Livingston County are directly liable; and</li>
<li>Defendants Livingston County, Chief Deputy Yasso, and Sheriff Dougherty are liable in their supervisory capacities.</li>
</ol>

(4) a § 1983 claim for excessive force, alleging that:

<ol type="a">
<li>Defendants Corporal Newton and Deputy Shepard are directly liable; and</li>
<li>Defendants Livingston County, Chief Deputy Yasso, and Sheriff Dougherty are liable in their supervisory capacities.</li>
</ol>

(5) a state-law negligence claim against Sheriff Dougherty.

ECF No. 49. The Court discusses each claim in turn.

## DISCUSSION

**I.  Deliberate Indifference to Medical Needs (Knee Condition)**

Barrett alleges that he has a history of medical problems related to his right knee, including "dislocation of the patella." *Id.* ¶ 40. He claims that, while at the Livingston County Jail, jail and medical staff failed to provide him with adequate treatment for his condition. He also claims that Livingston County and supervisory officials failed to employ proper oversight or implement adequate policies for handling inmate medical complaints.

**a.  Facts**

**i.  Jail's Medical Procedures**

Medical staff at the Livingston County Jail adhered to the following procedures in resolving inmate medical complaints. Generally, an inmate could request medical services by submitting a health care request form, which correctional officers provided upon request. These forms would be forwarded to the nurses who worked at the jail. Nurses could respond and treat some complaints themselves, while others would need to be referred to Dr. Aguirre, the physician who provided medical services at the jail.

The parties dispute Dr. Aguirre's role and responsibilities at the Livingston County Jail. Dr. Aguirre is a physician in private practice. Since the early 2000s, Dr. Aguirre has provided medical services to inmates at the Livingston County Jail. Dr. Aguirre alleges that he began to provide services pursuant to an informal, oral agreement between him and a former Livingston County Sheriff that has continued to the present day. He contends that he merely provides primary care services to inmates and is compensated by Livingston County at a rate of $120 per hour. By contrast, Barrett asserts that Dr. Aguirre has a supervisory role at the jail. Citing various evidence, Barrett argues that Dr. Aguirre is responsible for arranging "all levels" of health care for inmates at the jail; approving policies and procedures regarding the jail's health care; and approving and assisting with training programs for jail staff. ECF No. 71-14 at 1.

Regardless, the nursing staff acted as the liaison between Dr. Aguirre and inmates. If a nurse had a question or needed to get an order from a physician, they would contact Dr. Aguirre's office—usually by phone. Dr. Aguirre did not receive or see the health care request forms directly. Dr. Aguirre would normally visit the jail once per week. The nursing staff would assemble a "MD list" of issues they wanted Dr. Aguirre to review on those weekly visits. ECF No. 90-1 at 56.

Chief Deputy Yasso is the jail superintendent. He is the "chief administrative officer" at the jail, in that he creates and modifies jail policies, oversees the budget, and handles hiring, disciplining, firing, and supervising jail staff. ECF No. 84-6 at 24. He reports to the undersheriff, who, in turn, reports to Sheriff Dougherty. *Id.* at 25.

### ii. Barrett's Knee Complaints

In the early 2000s, Barrett suffered two dislocations in his right knee. Since that time, Barrett has had chronic problems with his right knee, including pain and instability. During prior

periods of incarceration at the Livingston County Jail, Dr. Aguirre treated Barrett for right knee pain.

The events underlying this action took place in 2013 and 2014, during Barrett's more recent period of incarceration at the Livingston County Jail. Barrett entered the jail on November 23, 2013. Neither the initial classification listing nor the nursing assessment, which were executed shortly after Barrett's admission, identify that Barrett had or complained of knee problems. Barrett brought a knee brace to the jail when he was admitted, but it was confiscated.

Barrett alleges that he consistently complained to medical staff that he had pain in his right knee and felt that it was shifting and might dislocate. He routinely requested medication, a knee brace, and a referral to his private specialist. Barrett asserts that when he met with nurses, they would "act like [they were] going to help me, then they'd pretend they'd care and nothing would get done, so I'd have to write a grievance. And then they'd pretend they wanted to help me again, and then they'd just disappear." ECF No. 84-3 at 95. This cycle continued throughout Barrett's incarceration.

The medical records indicate that Barrett first complained of knee pain on December 10, 2013. He met with Nurse Braaten, who provided him with a cold compress.

Barrett did not make another complaint regarding his right knee until March 2014. During the intervening period, Barrett came into possession of a knee brace, which reduced the pain, swelling, and instability he felt. Barrett did not wear the knee brace at all times: he would wear the brace when he was exercising or "doing a lot of walking around" on a particular day. ECF No. 84-3 at 103.

On March 9, 2014, Barrett submitted a health care request form for "serious knee problems." ECF No. 71-7 at 179. On March 14, Nurse Yunker met with Barrett. She explained

to Barrett that he "needs to be careful when exercising and that he will not have [surgery] while" at the jail.[2]  *Id.* at 130.  Barrett was seen by Dr. Aguirre on March 17.  *See id.* at 180.  Barrett informed Dr. Aguirre that, prior to his incarceration, he had been seeing a specialist, Dr. Robert Capecci, for his knee pain.  *Id.*  Barrett also told Dr. Aguirre that he had a knee brace that he wore on occasion.  *Id.*  Dr. Aguirre did not prescribe any formal treatment at that time, but in his notes he indicated that he would review Dr. Capecci's notes and x-ray findings.  In his affidavit, Dr. Aguirre explains that he wanted to review Dr. Capecci's notes to "consider further treatment and/or recommendations."  ECF No. 71-6 ¶ 11.

On the same day, Nurse Schinski sent a fax to Dr. Capecci's office requesting copies of progress notes and x-ray findings for Barrett.  Barrett alleges that Dr. Capecci's office forwarded those records to the jail on March 25.  The record is unclear as to what occurred with these records—Barrett alleges that Dr. Aguirre "either failed to review these records or Jail personnel failed to make them available for review."  ECF No. 82 at 13.  Regardless, it does not appear that Dr. Aguirre or any nurse reviewed the records, so no further treatment for Barrett's right knee pain was prescribed at that time.

On March 29, 2014, Barrett submitted a health care request form.  ECF No. 71-7 at 176.  Barrett did not request any services related to his right knee, but there is a notation from Nurse Braaten indicating the treatment she provided to Barrett on May 31.  *See id.*  In that notation is simply the phrase "[right] knee," without any further clarification.  *Id.*  It is therefore unclear what, if any, treatment Barrett received for his knee complaints on May 31.

On April 14 and April 19, 2014, Barrett submitted health care request forms complaining about pain in his right knee.  In the later request, Barrett specifically noted that he wanted to talk

---

[2] At her deposition, Nurse Yunker clarified that she meant that "we didn't send inmates for *elective* surgeries."  ECF No. 76-5 at 7 (emphasis added).

about "getting a brace," which suggests that Barrett had lost his knee brace around that time.[3]  *Id.* at 164.  There is no indication in the record that medical staff treated or otherwise responded to these requests.

On May 5, 2014, Barrett sent a letter to Sheriff Dougherty to meet with him "as soon as possible."  ECF No. 76-9 at 11.  On May 6, Sheriff Dougherty and Chief Deputy Yasso met with Barrett at his cell.  Among other things, Barrett told them about his knee problems and the pain it was causing.  ECF No. 84-3 at 91.  He requested a knee brace and asked to see a specialist or obtain an MRI or X-ray.  *Id.*  As Barrett alleges, the officials responded that "they were going to get it checked into and they would see what could be done."  *Id.* at 92.  The record does not disclose what, if any, action Sheriff Dougherty and Chief Deputy Yasso took after this meeting.

On May 7, 2014, Barrett filed a health care request form in which he stated, "Was supposed to be getting a knee brace I thought.  My knee is really bothering me I've been complaining for months."  ECF No. 71-7 at 156.  On May 12, Nurse Schinski met with Barrett to discuss his complaints.  In her narrative notes, Nurse Schinski writes, "Inmate wants knee brace.  Ordered brace has metal which is inappropriate.  Will check with supervisor re:soft knee support."  *Id.* at 131.  It is not clear whether Nurse Schinski met with any supervisor after the appointment.

Two days later, on May 14, 2014, Barrett filed another health care request form.  *See id.* at 155.  He writes, "I have serious knee problems.  I have a lot of pain and swelling.  My outside knee specialist made strict orders to me and a perscription [sic].  I'd like help."  *Id.*  It appears that Nurse Schinski discussed this issue with a sergeant and Sheriff Dougherty, but she testified that she could not recall what the outcome of that discussion was.

---

[3] Barrett believes that correctional officers may have confiscated his knee brace after his suicide attempt in mid-April 2014.  *See* ECF No. 84 at 11.

On May 17, 2014, Barrett submitted a health care request form stating that he "would like to touch base on what jail knows or is going to do about my knee." *Id.* at 159. There is no indication that medical staff acted on Barrett's request.

On May 22, 2014, Barrett filed another health care request form. He stated that his right knee was "having serious problems," including that there was fluid in his kneecap and that it was shifting out of place. *Id.* at 158. That same day, Nurse Yunker met with Barrett. Her narrative notes indicate that Barrett was complaining that his right knee was in pain and "popping out" and that he wanted a knee brace. *Id.* at 132. Nurse Yunker contacted Dr. Aguirre, who denied Barrett's request for a knee brace and indicated that he would evaluate the knee on his next visit to the jail. *Id.* In his affidavit, Dr. Aguirre surmises that he "likely denied [the request] at this time" because he wanted to "review any records available, in particular, Dr. Capecci's records that had been requested." ECF No. 71-6 ¶ 14.

On May 27, 2014, Nurse Braaten sent a fax to Dr. Capecci's office requesting Barrett's medical records. Dr. Capecci's office faxed the records on May 29, 2014.

Also on May 29, 2014, Chief Deputy Yasso sent an email to Nurses Schinski, Braaten, and Yunker. It reads:

> As you are aware inmate Barrett has complained about not getting proper care for his knee problem. Barrett filed a grievance which I handled today. He was advised that if the doctor agrees he will be provided a soft style knee support. He cannot have the one from his property. Nurse Braaten advised that he is scheduled to be seen by the doctor [on June 2nd]. I advised him to drop a sick call slip just to confirm.

ECF No. 84-7 at 167.

It appears that, on May 30, 2014, Dr. Aguirre reviewed the records from Dr. Capecci's office and recommended that Barrett receive a soft support for his knee.

On June 2, 2014, Dr. Aguirre met with Barrett. Barrett was complaining of "right patellar instability," though Dr. Aguirre noted that Barrett was in no apparent distress and was walking without difficulty or limp. ECF No. 71-6 ¶ 16. Barrett requested that he be able to restart physical-therapy exercises he had been given from Dr. Capecci. Dr. Aguirre recommended that Barrett continue with those exercises and indicated that he would discuss with Dr. Capecci what knee brace Barrett should be given. The next day, Dr. Capecci's office recommended a "black pull-up sleeve type brace." *Id.* ¶ 17.

On June 7, 2014—before a knee brace was provided to Barrett—Barrett fell while jogging. Correctional officers helped Barrett to his feet and assisted him to his cell. One officer brought Barrett ice and informed him that he would be seen by a nurse the next day. Barrett also filed a health care request form, stating that he was "in serious pain because [he] twisted [his] knee." ECF No. 71-7 at 146. Barrett goes on to write, "I told medical I need a knee brace, what is going on? I need x-rays and to see a specialist now." *Id.*

On June 8, Barrett filed another health care request form seeking assistance for his knee. At some point that day, Nurse Schinski visited Barrett at his cell. Barrett testified that his knee had "a lot of swelling and redness" and he could not walk at that time. ECF No. 84-3 at 110. Shortly after this incident, a knee brace was ordered for Barrett.

On June 12, 2018, Nurse Yunker met with Barrett to assess his complaints of knee pain resulting from his fall. She noted full range of motion, no redness or heat, and "less swelling on the knee cap than before." ECF No. 71-7 at 132.

On June 18, 2014, Nurse Schinski provided Barrett with a "black elastic knee support." *Id.* at 133.

Barrett was transferred to Elmira Correctional Facility on July 8, 2014. He continued to raise many of the same complaints regarding knee pain. *See, e.g.*, ECF No. 84-5 at 54-60. Barrett received an x-ray and MRI, after which he was diagnosed with an ACL tear. *See id.* at 19-21. He received surgery to repair the ACL in June 2015. *See id.* at 22-23.

### b. Analysis

Dr. Aguirre and the County Defendants argue that summary judgment is proper on this claim because, among other things, Barrett's knee condition was not sufficiently serious. The Court agrees.

"In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Wright v. Genovese*, 694 F. Supp. 2d 137, 153 (N.D.N.Y. 2010) (internal quotation marks omitted). This standard consists of two elements: "The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind." *Id.*

"In order to meet the objective requirement, the alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Id.* at 153-54. "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotation marks omitted). The objective requirement has two components. First is "whether the prisoner was actually deprived of adequate medical care." *Id.* Second is whether "the inadequacy in medical care is sufficiently serious." *Id.* at 280.

To determine whether the inadequacy in medical care is sufficiently serious, a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has

caused or will likely cause the prisoner." *Id.* "[A] sufficiently serious condition is 'a condition of urgency, one that may produce death, degeneration or extreme pain.'" *Green v. Misa*, No. 09-cv-1106, 2013 WL 2458775, at *7 (W.D.N.Y. June 6, 2013). In addition, a serious medical condition may exist where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (internal quotation marks omitted). "The Second Circuit recognizes several factors relevant to the seriousness of a medical condition including: (1) the existence of an injury that a reasonable doctor or patient would find important or worthy of comment or treatment; (2) the presence of a medical condition that significantly affects a person's daily activities; and (3) the existence of chronic and substantial pain." *Green*, 2013 WL 2458775, at *7. "Because the objective component of an Eighth Amendment claim is . . . necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks, brackets, and citation omitted).

There is substantial case law in this Circuit on the issue of whether knee injuries constitute serious medical conditions for Eighth Amendment purposes. Many courts have found certain common knee injuries "insufficient to trigger Eighth Amendment protection," including meniscal tears, ruptured ACLs, and degenerative arthritis. *Johnson v. Wright*, 477 F. Supp. 2d 572, 575 (W.D.N.Y. 2007), *aff'd* 324 F. App'x 144 (2009) (collecting cases); *see also Henderson v. Sommer*, No. 08 Civ. 3440, 2011 WL 1346818, at *3 (S.D.N.Y. Apr. 1, 2011). This position appears to be founded on the observation that these sorts of knee injuries are common and can exist without causing any symptoms or practical limitations. *See, e.g.*, *Espinal v. Coughlin*, No. 98 CIV. 2579, 2002 WL 10450, at *4 (S.D.N.Y. Jan. 3, 2002); *Culp v. Koenigsmann*, No. 99 Civ.

9557, 2000 WL 995495, at *4 (S.D.N.Y. July 19, 2000). By contrast, some courts have found certain knee problems to be serious medical conditions, particularly where the injury causes functional limitations or chronic, severe pain. *See Hodges v. Northrup*, No. 10-cv-531, 2014 WL 316729, at *7 (N.D.N.Y. Jan. 28, 2014); *Rosario v. Anson*, No. 12-cv-1506, 2013 WL 5236568, at *9 (N.D.N.Y. Sept. 17, 2013).

In this case, no reasonable jury could find that Barrett's knee condition was sufficiently serious. The record establishes that Barrett's condition did not cause chronic and substantial pain or significantly affect his daily activities. While at the jail, Barrett's knee condition caused his kneecap to shift, pop out, and grind, causing instability, pain, swelling, and redness, as well as creating a "ball of fluid" in his knee. ECF No. 84-3 at 102. Barrett variously complained that his knee was "killing [him]," that his knee was "really bothering [him]," and that he had "serious pain." *Id.* at 91; ECF No. 71-7 at 156, 170. Nevertheless, at his deposition, Barrett described the pain in his right knee as follows: "It was just a constant pain for years. It's not excruciating pain, it's more of a discomfort, and on top of that, I could feel my kneecap shifting around my leg. There was a little bit of instability, and I could just tell something wasn't right in there." ECF No. 84-3 at 106. He went on to say, "Since I had the dislocations, it's just been a little bit of a discomfort, but when I go without the knee brace, it obviously made it worse and I think it deteriorated things a lot quicker and there was more pain, more swelling." *Id.* Even on June 6, 2014—the day before he fell and more than a month after his knee brace was confiscated—Barrett described his knee pain as "a little discomfort."[4] *Id.* at 107.

Given Barrett's own description, the pain associated with his knee complaints is not the sort of "extreme pain" that renders a medical need sufficiently serious. *Hathaway v. Coughlin*, 99

---

[4] Specifically, Barrett was asked to describe his pain on a "1-to-10" scale, with "10" being "excruciating pain." ECF No. 84-3 at 107. Barrett stated his pain was "[p]robably, like, a four, a little discomfort." *Id.*

F.3d 550, 553 (2d Cir. 1996) (stating that the medical condition must be "one that may produce death, degeneration, or extreme pain"); *see also Steele v. Ayotte*, No. 17-cv-1370, 2018 WL 731796, at *12 (D. Conn. Feb. 6, 2018) ("Complaints of discomfort do not rise to the level of a serious medical need."); *Salaam v. Adams*, No. 03-cv-517, 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006) (medical condition was not serious where, among other things, the plaintiff's complaints "to medical staff were sporadic and moderate or mild in nature (i.e., not characterized by Plaintiff as 'severe,' 'extreme,' 'agonizing,' 'excruciating,' etc.)"); *Perry v. Tichler*, No. 06-cv-1361, 2009 WL 1076205, at *4 (N.D.N.Y. Apr. 21, 2009) (stating that knee injuries like a torn collateral ligament, "while uncomfortable and painful, do not constitute serious medical conditions").

Similarly, the record does not reflect that Barrett's knee condition significantly affected his daily activities. Barrett identifies no particular daily activities that he could not perform as a result of his knee condition. He does not contend that his knee problems threatened his ability to walk or that his pain was so debilitating as to interfere with any other activities of daily living. *See, e.g.*, *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (inmate adequately alleged serious dental condition, where, *inter alia*, he claimed that he was "unable to eat properly"). To the contrary, Barrett testified that he would wear a knee brace only when he was exercising or if he was "doing a lot of walking around." ECF No. 84-3 at 103. Dr. Aguirre's notes from the June 2, 2014 appointment—more than a month after Barrett's knee brace was confiscated—indicate that Barrett was in no apparent distress, was walking without difficulty, and did not have a limp. *See* ECF No. 71-7 at 101. Even Barrett's jogging routine was not significantly interrupted by the confiscation of the knee brace: he continued to jog in the gym area for one hour every day. *See* ECF No. 84-3 at 104-05; *id.* at 105, 107 (stating that jogging without a knee brace was "hard" and that he "just

13

tried to take it a little easier, less fast running, slower jog"); *see also Price v. Engert*, 589 F. Supp. 2d 240, 246 (W.D.N.Y. 2008) (concluding that injuries to knee, wrist, and hand were not serious where, among other things, inmate was playing basketball two weeks after incurring his injuries).

There is one matter that merits additional discussion: the injury that Barrett incurred when he fell while running on June 7, 2014. The parties dispute whether, as a result of this fall, Barrett sustained the ACL and meniscal injuries for which he received surgery in 2015. Even assuming that he did, it does not appear that the injuries amounted to a serious medical need. Barrett testified that he felt "excruciating pain" immediately after his fall; that there was "a lot of swelling and redness" in his knee; and that he was largely confined to his bed for three days. ECF No. 84-3 at 109-11. But by June 10, the pain "subsided a little bit," *id.* at 111, and by June 12, Nurse Yunker noted on examination that Barrett had full range of motion, no redness or heat in his knee, and less swelling on his kneecap. Barrett was able to restart his jogging routine before he left the jail in July. An examination performed at the Elmira Correctional Facility on July 16, 2014 appears to indicate that Barrett was in no apparent distress and showed no antalgic gait or gait abnormalities. *See* ECF No. 84-5 at 60. Barrett did testify in October 2014 that his knee hurt "a lot more" and that there was "more shifting" after he fell. ECF No. 84-7 at 94. Even so, given the level of pain and the absence of functional limitations, Barrett has not created a genuine issue of material fact as to whether his medical need was sufficiently serious.[5]

---

[5] Although not the focus of any party's briefing, the Court notes that Barrett's medical expert, Dr. Tebor, also opined that the delay in treatment exposed Barrett to a risk of future harm. Specifically, Dr. Tebor opines that as a "result of the long term delay in appropriate treatment and bracing," there is a "high likelihood" that Barrett "will develop significant degenerative arthritis in his knee over the next 10 to 20 years with progressive symptoms each year." ECF No. 71-12 at 8. Dr. Tebor states that "[t]he degenerative arthritis that develops will require additional medical treatment to control the associated pain, and has the potential to limit Mr. Barrett's mobility as symptoms progress." *Id.*

It is true that "an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm." *Smith*, 316 F.3d at 188. Here, however, Barrett does not develop

Accordingly, because Barrett cannot satisfy the objective prong of his deliberate-indifference claim, that claim must be dismissed against those defendants whom he seeks to hold directly liable—Dr. Aguirre, Nurses Schinski, Yunker, and Braaten, Sheriff Dougherty, Chief Deputy Yasso, and Livingston County.

In addition, because there is no underlying constitutional deprivation with respect to Barrett's knee condition, Dr. Aguirre, Sheriff Dougherty, Chief Deputy Yasso, and Livingston County may not be held liable under a supervisor theory.[6] *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (noting that a municipality may be liable under § 1983 only insofar as the "policies or customs that it has sanctioned . . . led to an independent constitutional violation"); *Garcia-Garcia v. City of New York*, No. 12 Civ. 1302, 2013 WL 3832730, at *10 (S.D.N.Y. July 22, 2013) ("[W]here there is no underlying deprivation of rights, there can be no supervisory liability." (internal quotation marks omitted)).

Therefore, Barrett's § 1983 claim for deliberate indifference to his medical needs is dismissed as to all defendants.

---

any argument that the risk of degenerative arthritis, standing alone, is sufficiently serious for Eighth Amendment purposes. Moreover, Barrett does not argue that any of the defendants was actually aware of that particular risk and consciously disregarded it. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993). Without more, the Court is not in a position to assess the merits of such a claim. *See Striker Sheet Metal II Corp. v. Harleysville Ins. Co. of N.Y.*, No. 16-cv-5916, 2018 WL 654445, at *11 (E.D.N.Y. Jan. 31, 2018) ("[A] party that fails to raise an argument in its opposition papers in a motion for summary judgment has waived that argument."); *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

[6] Barrett has raised claims against Sheriff Dougherty and Dr. Aguirre both in their individual and official capacities. Such claims are redundant insofar as Barrett has also brought claims against Livingston County itself. *See Wallikas v. Harder*, 67 F. Supp. 2d 82, 83 (N.D.N.Y. 1999) ("[C]laims against municipal officials in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant."). Moreover, because all of Barrett's claims for supervisory and *Monell* liability do not survive summary judgment, neither Sheriff Dougherty nor Dr. Aguirre may be held liable in their official capacities.

## II.     Deliberate Indifference to Mental-Health Needs

Barrett has a history of mental-health treatment and incidents involving self-harm. *See* ECF No. 49 ¶¶ 17, 18. He alleges that in April 2014, there was an acute risk that he would attempt suicide, and jail and medical staff were deliberately indifferent to that risk. He raises these allegations as two separate § 1983 claims—deliberate indifference and failure to protect. Most courts analyze such allegations "as an Eighth Amendment claim dealing with the inadequate provision of medical care." *Bell v. Gillani*, No. 10-cv-1577, 2013 WL 5304188, at *10 n.14 (N.D.N.Y. Sept. 19, 2013); *see also Allah v. Kemp*, No. 08-cv-1088, 2010 WL 1036802, at *4 (N.D.N.Y. Feb. 25, 2010). The Court will therefore evaluate both of Barrett's claims within that framework.

### a.   Facts

When Barrett was admitted into the Livingston County Jail in November 2013, a booking officer asked Barrett questions regarding his mental health as part of the intake process. The intake form indicates that Barrett had a history of mental health treatment and a previous suicide attempt.

Barrett was referred to mental health treatment and continued to receive the medications for his mental health that he had previously been prescribed. Barrett estimates that he saw the jail's mental health therapist approximately every two to four weeks, unless he had a nervous breakdown, in which case he would "sometimes see her sooner." ECF No. 76-3 at 79.

Barrett harmed himself on several occasions while at the jail. In late November 2013, Barrett and another inmate were involved in a fight. Officers broke up the fight and moved Barrett to the booking area. While there, Barrett had what he describes as a nervous breakdown with feelings of hopelessness and helplessness. Barrett cut himself with a spork, and punched and hit his head against the walls. Officers intervened and placed Barrett in a restraint chair until he

calmed down. Corporal Newton was involved in responding to this incident. On February 8, 2014, Barrett was involved in another fight with an inmate. After being restrained, Barrett slammed his head against a wall and the floor. Officers were able to further restrain Barrett and calm him down. Corporal Newton also responded to this incident.

On February 19, 2014, Nurse Schinski conducted a mental health assessment of Barrett after he complained of mental health issues. *See* ECF No. 71-7 at 182. Barrett told Nurse Schinski that he felt alright "at this moment" but also felt "like [he's] going to snap." ECF No. 76-6 at 49. Barrett told her that he was currently in mental health treatment and was taking medication associated with that treatment, that he was having "troubling thoughts at this time," and that he had a history of cutting himself. *Id.* In response to the question "Have you ever thought about hurting yourself," Barrett responded "dream of suicide." *Id.* Nurse Schinski noted that Barrett was at moderate-to-high risk of suicidal ideation based on this assessment. Nevertheless, between March 10 and April 21, 2014, Barrett did not request to see the jail's mental health therapist. ECF No. 84-1 ¶ 40. On April 21, Barrett met with the mental health therapist and denied having thoughts of "lethality." ECF No. 76-6 at 20.

The most relevant events for purposes of Barrett's mental-health claim occurred between April 23 and 25, 2014. On April 23, 2014, at approximately 10 p.m., Barret began arguing with a correctional officer when the officer refused to let him obtain hot water. Barrett testified that at that point, he had a nervous breakdown and "all hell broke loose." ECF No. 76-3 at 84-85. He began hitting his head against a wall, punching himself, and threatening responding officers. Barrett then started scratching his wrists with a spork. Corporal Newton used pepper spray to stop Barrett, and officers restrained him. While he was on the ground, Barrett said "Kill me, I want to die. Just get it over with." ECF No. 84-3 at 51. Barrett was taken to the shower for

decontamination. During the shower, Barrett spoke with Corporal Newton. Barrett was "in tears" and vented about his family and criminal charges. *Id.* at 50. Corporal Newton assured him that he would "see mental health first thing in the morning." *Id.* At his deposition, Barrett testified that at that time, he "wanted to die," felt "helpless," and "wanted the pain to end." *Id.* at 55.

On the morning of April 24, 2014, Nurse Schinski visited Barrett at his cell to evaluate his condition after the incident from the previous night. Barrett alleges that Nurse Schinski calmed him down and allowed him to vent about his issues. Barrett disclosed to her that, on the previous evening, he was "very suicidal" and "wanted to die." ECF No. 84-3 at 59. Although Barrett told Nurse Schinski he "felt better than [he] did the night before," he also told her that he "wanted to see mental health." ECF No. 84-3 at 60.

Neither Corporal Newton nor Nurse Schinski followed up on Barrett's requests. Instead, Barrett was taken out of the jail for a court appearance, from which he did not return until the late afternoon. By that time, the mental health therapist was no longer available. In addition, it appears that Chief Deputy Yasso was notified of the April 23, 2014 incident by Corporal Newton and reviewed unspecified documentation relating to that incident. In the afternoon of April 24, Chief Deputy Yasso sent an email to the responding officers commending their response to the April 23 incident and noting that "[t]he incident was documented well." ECF No. 84-6 at 47.

On the evening of April 24, Barrett filed a grievance complaining that jail staff was not taking his "mental health problems seriously." ECF No. 84-7 at 162. He described his suicidal thoughts and his belief that he was "going crazy." *Id.* Furthermore, at some point on the night of April 24, Barrett requested a shaving razor. Barrett testified at his deposition that he "didn't give a shit" and "wanted to kill [himself]." ECF No. 76-3 at 99.

On the morning of April 25, a correctional officer provided Barrett with a shaving razor. Barrett "broke down the razor," wrote a suicide note, and began cutting himself. ECF No. 76-3 at 100. He soon started "second guessing things" and shouted out to an officer for help. *Id.* Correctional officers and Nurse Schinski responded. Barrett was transported to a nearby hospital and received stitches for his wrist wound.

### b. Analysis

The County Defendants challenge both prongs of Barrett's claim, arguing that there is insufficient evidence (1) that Barrett was "suicidal or required immediate mental health treatment" after the April 23, 2014 incident, ECF No. 90-2 at 7; and (2) that any of the defendants acted with the requisite state of mind. Except as to Sheriff Dougherty and Livingston County, the Court disagrees and concludes that genuine issues of material fact preclude summary judgment.

As discussed above, "there are both objective and subjective requirements to succeed on an Eighth Amendment claim regarding serious mental health needs." *Young v. Choinski*, 15 F. Supp. 3d 194, 198 (D. Conn. 2014). The objective component requires that the deprivation of adequate mental health care be "sufficiently serious." *Id.* "In the context of mental health needs, propensities to attempt suicide, harm oneself, and/or exhibit severe depression or anxiety attacks have been viewed as 'sufficiently serious.'" *Id.* at 199; *see also Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) ("A propensity to attempt suicide or harm oneself is undoubtedly a serious medical condition . . . .").

Regarding the subjective requirement, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Goord*, 467 F.3d at 280. "Deliberate indifference is a mental state

equivalent to subjective recklessness, as the term is used in criminal law." *Id.* "Deliberate indifference exists when the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Wassmann v. Cnty. of Ulster*, No. 11-cv-676, 2012 WL 4711985, at *2 (N.D.N.Y. Oct. 3, 2012) (internal quotation marks omitted).

### i. Direct Liability

The Court first examines Barrett's claim as it pertains to those defendants who are alleged to be directly liable for deliberate indifference—Nurse Schinski, Sheriff Dougherty, Chief Deputy Yasso, Corporal Newton, and Livingston County.

With respect to the objective component, there is a genuine issue of material fact as to whether Barrett had a sufficiently serious mental health need between April 23 and 25, *i.e.*, a propensity to attempt suicide or seriously harm himself. As a general matter, there is evidence that Barrett had a history of acts of self-harm and suicide attempts. There is also evidence that Barrett had a mental health condition that sometimes resulted in aggressive outbursts directed at himself or others. Such outbursts were often precipitated by interpersonal or intrapersonal conflict.

Consistent with such evidence, Barrett testified that he was suffering from anxiety, depression, and stress in the days leading up to April 25. He further testified that he intended to commit suicide after the April 23, 2014 incident, which intent he attempted to carry out by obtaining and cutting himself with a razor on April 25. Thus, there is sufficient evidence that Barrett had a general propensity to attempt suicide or harm himself and that he had an acute risk of doing so in the aftermath of the April 23 incident. A reasonable jury could further conclude that Barrett did not receive adequate medical care for his condition in the lead up to his attempted

suicide on April 25, insofar as Barrett received no mental health treatment and jail officials took no precautionary measures. There is sufficient evidence supporting the objective prong for purposes of summary judgment.

As for the subjective component, the Court must analyze this requirement separately with respect to each defendant. *See Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003). The question of whether a defendant has "the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Silvera v. Dep't of Corrs.*, No. 09-cv-1398, 2012 WL 877219, at *10 (D. Conn. Mar. 14, 2012). A factfinder may also conclude "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

A genuine issue of material fact exists as to whether Nurse Schinski acted with deliberate indifference. There is evidence in the record that Nurse Schinski was generally aware of Barrett's tendencies towards self-harm. She evaluated Barrett in February 2014 and noted that he had previously cut himself, that he dreamed of suicide, and that he was at moderate-to-high risk for suicide. Furthermore, there is evidence from which a reasonable jury could infer that Nurse Schinski knew there was an acute risk that Barrett would attempt suicide after he met with her on April 24: Nurse Schinski knew Barrett had harmed himself the previous night; Barrett told Nurse Schinski that he had felt "very suicidal" and had "wanted to die" the previous night; Barrett disclosed to Nurse Schinski "a bunch of" his current problems; and Barrett requested to "see mental health." ECF No. 84-3 at 59-60. Because Nurse Schinski took no action in response, a reasonable jury could find that she acted with deliberate indifference. *See Engles v. Jones*, No. 13-cv-6461, 2018 WL 6832085, at *6 (W.D.N.Y. Dec. 28, 2018) (genuine issue of material fact existed where inmate threatened suicide and correctional officer took no action); *Young*, 15 F.

Supp. 3d at 185 (summary judgment denied to correctional officer, where there was evidence that inmate told officer he was feeling suicidal and asked to see mental health unit, but officer took no action).

A genuine issue of material fact exists as to whether Corporal Newton acted with deliberate indifference. There is evidence that Corporal Newton was aware that Barrett had a history of self-harm and had symptoms consistent with suicidal ideation: Corporal Newton was involved in several incidents at the jail in which Barrett harmed himself, and he testified at his deposition that Barrett exhibited symptoms of suicidal ideation during the November 2013 incident. There is also evidence from which a reasonable jury could infer that Corporal Newton knew there was an acute risk that Barrett would attempt suicide after the April 23 incident: Barrett harmed himself on the night of April 23; Barrett said "Kill me, I want to die. Just get it over with," when Corporal Newton and other officers were attempting to restrain him on April 23; directly after that incident, Barrett was in tears, disclosed his personal problems to Corporal Newton, and requested to see mental health; and Corporal Newton told Barrett that they were going to help him and assured him that he would see the mental health therapist the next day. ECF No. 84-3 at 49-51.

A genuine issue of material fact exists as to whether Chief Deputy Yasso acted with deliberate indifference. Like Corporal Newton, there are genuine issues of material fact regarding the extent to which Chief Deputy Yasso knew of Barrett's general propensities towards self-harm and the acute risk he posed to himself after the April 23 incident. Barrett testified that he had "dozens" of conversations with Chief Deputy Yasso regarding his mental health treatment at the jail. *Id.* at 120. Furthermore, regarding the April 23 incident specifically, Corporal Newton briefed Chief Deputy Yasso about the incident on April 23, and Chief Deputy Yasso reviewed documentation relating to the incident on April 24. It is not entirely clear what information

Corporal Newton conveyed to Chief Deputy Yasso or what particular documentation Chief Deputy Yasso reviewed. Still, taking the evidence in the light most favorable to Barrett, a reasonable jury could conclude that Corporal Newton conveyed the information he himself allegedly possessed: that Barrett had harmed himself and stated he wanted to die during the April 23 incident; that Barrett was in tears and disclosed he was suffering from a number of personal problems after the incident; and that Barrett requested to see the mental health therapist. Consequently, a reasonable jury could infer that Chief Deputy Yasso knew there was an acute risk that Barrett would attempt suicide after the April 23 incident and that he nonetheless took no action in response. Barrett's claim against Chief Deputy Yasso survives summary judgment. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that a supervisory defendant may be held liable under § 1983 to the extent that he "participated directly in the alleged constitutional violation").

No genuine issues of material fact exist as to whether Sheriff Dougherty or Livingston County acted with deliberate indifference, and they are entitled to summary judgment on the claim for direct liability. Barrett highlights no facts suggesting that these defendants were personally involved in the events occurring on April 23 through 25, or that they were aware of—let alone deliberately indifferent to—the acute risk of harm Barrett posed to himself in the aftermath of the April 23 incident. *See Clark v. Gardner*, 256 F. Supp. 3d 154, 166 (N.D.N.Y. 2017) ("Because vicarious liability is inapplicable to . . . § 1983 suits, supervisory officials may not be held liable merely because they held a position of authority." (internal quotation marks and citation omitted)).

The Court recognizes that the County Defendants have cited a variety of evidence—from multiple sources, including Barrett himself—to show (1) that Barrett was not, in fact, at risk of suicide and (2) that the defendants did not act with deliberate indifference. But this Court may not resolve factual disputes or credibility issues on summary judgment. That task is reserved for the

jury.  *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).  The existence of contrary evidence merely supports, rather than undermines, the Court's conclusion that summary judgment is inappropriate as to Nurse Schinski, Corporal Newton, and Chief Deputy Yasso.  By contrast, the absence of evidence to implicate Sheriff Dougherty and Livingston County compels the conclusion that they are entitled to summary judgment on the direct-liability aspect of this claim.

### ii.  Supervisory Liability

The Court turns to Barrett's claim for supervisory liability against Livingston County, Chief Deputy Yasso, and Sheriff Dougherty.  Barrett appears to identify four policies for which these defendants may be held liable.  First, Barrett notes that Corporal Newton notified Chief Deputy Yasso, but not Sheriff Dougherty, about the April 23, 2014 incident, based on Sheriff Dougherty's policy that information should be disseminated through the chain of command.  Second, Barrett states that in April 2014, the jail's policy was not to place an inmate in suicide garb unless the inmate was attempting to commit suicide with his clothing.  Third, Barrett asserts that the jail had no policy restricting inmates likely to engage in self-harm from obtaining a shaving razor.  Fourth, Barrett argues that these defendants failed to train nurses on the jail's suicide-prevention policy.  The Court concludes that Chief Deputy Yasso, Sheriff Dougherty, and Livingston County are entitled to summary judgment on this claim as it pertains to supervisory liability.

As to Livingston County, "[a] municipality may be liable under § 1983 only if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted).  As a result, "municipalities are responsible only for their own illegal acts, and cannot be held vicariously liable under § 1983 for their employees' actions."  *Id.* (internal

quotation marks omitted). "[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Id.*

As for Chief Deputy Yasso and Sheriff Dougherty, "in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Lara-Grimaldi v. Cnty. of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *10 (S.D.N.Y. Mar. 29, 2018). Personal involvement may be established in one of five ways:

> (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at *11 (internal brackets omitted).

Here, the first three policies that Barrett identifies—the chain-of-command notification policy; the suicide-garb policy; and the absence of a shaving-razor policy—do not suffice to establish liability against these defendants. This is because Barrett fails to articulate any causal connection between those policies and the constitutional deprivation at issue—namely, the alleged failure of Corporal Newton, Nurse Schinski, and Chief Deputy Yasso to refer Barrett to mental health services or otherwise take precautionary measures despite knowing that Barrett was at a substantial risk of attempting suicide. Barrett does not explain how any of the listed policies contributed to or caused that constitutional violation. *See Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *12 (S.D.N.Y. Mar. 26, 2015) ("[T]here must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." (internal quotation marks omitted)). To the contrary, the jail's suicide-prevention policy is clear that once

a staff member recognizes "that an inmate is at risk for suicide," the inmate should be placed in a housing area "that affords . . . constant surveillance . . . until the inmate can be further assessed by a mental health professional." ECF No. 84-7 at 9. Thus, if, as Barrett claims, the above defendants failed to take action despite knowing that Barrett was at risk for suicide, they acted contrary to, not consistent with, jail policy. *See Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) ("[T]o hold the municipality liable . . . the agent's actions must implement rather than frustrate the government's policy.").

Because Barrett fails to show how any of those three policies were a "moving force" behind the particular constitutional violation he raises, neither Livingston County, Sheriff Dougherty, nor Chief Deputy Yasso may be held liable under Barrett's theory.[7] *Hicks v. City of Syracuse*, No. 17-cv-475, 2018 WL 6308653, at *3 (N.D.N.Y. Dec. 3, 2018); *see Wilson v. City of Norwich*, 507 F. Supp. 2d 199, 206 (D. Conn. 2007) ("[A] supervisor may be liable if the plaintiff can 'affirmatively connect the supervisor's conduct to the subordinate's violative act or omission.'").

Likewise, Barrett's failure-to-train claim does not survive summary judgment. In support of his claim, Barrett relies on evidence showing that the nurses involved in this case "indicated in their [deposition] testimony that they did not recall if they had ever seen the [jail's suicide-prevention] policy before, and could not remember whether they had been trained on the policy." ECF No. 84 at 32. Barrett also asserts that Nurse Schinski's deposition testimony shows that she lacks familiarity with the signs of suicidal ideation that are listed in the suicide-prevention policy.

---

[7] To the extent Barrett is arguing that these defendants can be held liable because these three policies caused constitutional violations separate and apart from those he raises against Nurse Schinski, Corporal Newton, and Chief Deputy Yasso, he has failed to sufficiently develop such claims for the Court's review. *See Striker Sheet Metal II Corp.*, 2018 WL 654445, at *11; *Zannino*, 895 F.2d at 17.

Even assuming that the nurses in this case were not familiar with the jail's suicide-prevention policy, Barrett provides insufficient evidence to demonstrate the subjective component of a failure-to-train claim. For a municipality or a supervisor to be held liable, the "failure to train [the] employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (discussing municipalities); *see also Schnitter v. City of Rochester*, 931 F. Supp. 2d 469, 475 (W.D.N.Y. 2013) (discussing supervisors).[8] Barrett does not identify any evidence suggesting that there was a pattern of constitutional violations resulting from nurses' lack of familiarity with the jail's suicide-prevention policy; nor does he cite any evidence showing that Livingston County, Chief Deputy Yasso, or Sheriff Dougherty were aware of that pattern and took no action to rectify it. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Accordingly, the Court concludes that Sheriff Dougherty, Chief Deputy Yasso, and Livingston County are entitled to summary judgment on the supervisory liability claim.

### c. Conclusion

The County Defendants are entitled to summary judgment except with respect to the direct-liability claims against Nurse Schinski, Corporal Newton, and Chief Deputy Yasso.

---

[8] Some courts extend liability to a supervisor who is grossly negligently—as opposed to deliberately indifferent—in failing to train his subordinates. *See, e.g.*, *Samuels v. Fischer*, 168 F. Supp. 3d 625, 638-39 (S.D.N.Y. 2016). To the extent there is a conflict in the case law, the Court need not resolve it: under either standard, Barrett's claim against Sheriff Dougherty and Chief Deputy Yasso fails.

### III.  Excessive-Force Claim

Barrett alleges that correctional officers used excessive force to respond to an "emotional event" that he suffered in his cell on June 29, 2014.  ECF No. 49 ¶ 62.  Specifically, Barrett alleges that Corporal Newton used excessive force when he pepper sprayed him and that Deputy Shepard used excessive force when he kicked the cell door's tray slot closed on Barrett's thumb.  Barrett also brings claims for supervisory liability against Livingston County, Chief Deputy Yasso, and Sheriff Dougherty.

#### a.  Facts

On the evening of June 29, 2014, Barrett was eating dinner in his cell.  After eating about half of his dinner, Barrett noticed that there was a hair in his brownie.   Concerned that all of his remaining food was contaminated, Barrett asked an officer to replace his remaining food.  ECF No. 76-4 at 49.  Officers were willing to provide Barrett with a new brownie but refused to replace the other food.  Barrett asked to see Corporal Newton in order to complain.  Corporal Newton likewise refused to replace any other food beyond the brownie.  Barrett testified that, at that point, "everything went crazy again." *Id.* at 50.  Barrett began screaming, punching himself, and banging his head against the wall.

In response, Corporal Newton ordered Barrett to put his hands on the wall so that he could be taken to the booking area.  Barrett continued to bang his head against the wall and, in his words, "started going crazy." *Id.* at 52.  Barrett states he was having a "temper tantrum and nervous breakdown." *Id.*  Corporal Newton informed Barrett that he would use pepper spray if Barrett did not calm down, and when Barrett refused to comply, Corporal Newton sprayed Barrett.  Barrett's outburst continued despite the pepper spray, so Corporal Newton sprayed Barrett again through the tray slot of the cell door.

The parties' versions of events diverge at this point. Barrett alleges that the pepper spray had soaked his clothing and was "burning" him, so he took off his clothes. Barrett testified that while this was occurring, Deputy Shepard was "taunting" and "picking on" him, telling him he was a "screw up" and that officers were "always dealing with this." *Id.* at 55. Barrett testified that this was "just getting to [him]," so he told Deputy Shepard to "[s]uck on [his] dick and scrotum" and began "waving [his genitals] around." *Id.* at 56. Barrett then "cupp[ed]" his genitals in his hands, stuck them out of the tray slot, and told Deputy Shepard to "[s]uck on [his] dick and nuts." *Id.* at 56, 59. Within a few seconds, Deputy Shepard kicked the tray slot closed, which wedged Barrett's thumb into the slot. Barrett ripped his thumb out and began "bleeding everywhere." ECF No. 76-3 at 111. Barrett thereafter received medical attention for his thumb. Barrett suffered an injury to his thumb that required multiple stitches and resulted in nerve damage.

The County Defendants do not dispute that Deputy Shepard kicked the tray slot closed or that Barrett suffered an injury. Rather, the point of dispute concerns Barrett's and Deputy Shepard's motivations for their actions. The County Defendants allege that, after disrobing, Barrett attempted to defecate in his hand. When he could not do so, Barrett placed his genitals in the tray slot and aimed his penis at Corporal Newton. Believing that Barrett was attempting to urinate on Corporal Newton, Deputy Shepard kicked the tray slot closed.

### b. Analysis

Barrett develops no arguments opposing summary judgment as to Corporal Newton, Livingston County, Chief Deputy Yasso, or Sheriff Dougherty. Therefore, Barrett appears to have abandoned the excessive-force claim except as it relates to Deputy Shepard. *See Mattison v. Potter*, 515 F. Supp. 2d 356, 370 (W.D.N.Y. 2007) (collecting cases). The Court limits its analysis accordingly.

The County Defendants argue that, based on the undisputed facts, Deputy Shepard reasonably believed that Barrett was attempting to urinate on officers and that the amount of force he employed was *de minimis*. The Court concludes that genuine issues of material fact preclude summary judgment in Deputy Shepard's favor.

"Excessive use of force under [the] Eighth Amendment of the U.S. Constitution . . . requires courts to engage in a two-part inquiry, one objective and the other subjective. The subjective inquiry focuses on the defendant's motive and the objective inquiry on the conduct's effect." *Beauvoir v. Falco*, 345 F. Supp. 3d 350, 363 (S.D.N.Y. 2018).

"[U]nder the subjective test, a prisoner must show that the defendant acted with a 'sufficiently culpable state of mind.' In other words, a plaintiff must show that the defendant acted with 'wantonness in light of the particular circumstances surrounding the challenged conduct.'" *Id.* (internal citations omitted). "Wantonness asks 'whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' It is a test about necessity, intent, effect, and proportionality." *Id.* (internal citations omitted). To determine whether the defendant "acted maliciously or wantonly," a court examines the following factors: "the extent of the injury; the mental state of the Defendant; the need for the application of the force; the correlation between that need and the amount of the force used; the threat reasonably perceived by the Defendant[], and any efforts made by the Defendant[] to temper the severity of a forceful response." *Id.* (internal quotation marks omitted).

"[U]nder the objective test for cruel and unusual punishment, courts look at the harm done, in light of 'contemporary standards of decency.' Courts have stated, however, that in the excessive force context, there is essentially strict liability." *Id.* at 363-64 (citation omitted). This is because

"[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

Courts have held that correctional officers may use some measure of force to prevent an inmate from throwing or otherwise projecting bodily fluids on them. *See, e.g.*, *Benyamini v. Blackburn*, No. 13-cv-205, 2015 WL 5813661, at *6 (E.D. Cal. Sept. 30, 2015) (saliva); *Allen v. Lark*, No. 14-1404, 2015 WL 5474266, at *2 (D. Md. Sept. 15, 2015) (feces); *Laurensau v. Pluck*, No. 12-623, 2014 WL 6774125, at *5-6 (W.D. Pa. Dec. 1, 2014) (urine). This is reasonable in light of the health risks those actions may pose. *See Allen*, 2015 WL 5474266, at *2 ("Correctional officers have an objectively reasonable duty to protect themselves and other prisoners from contact with human waste and to subdue aggressive inmates undertaking [such] activities.").

Nevertheless, there are genuine issues of material fact precluding summary judgment on the claim against Deputy Shepard. The Court need not discuss each prong and each relevant factor exhaustively—it suffices to describe the events as articulated by Barrett.

Although the responding officers stated that they believed Barrett was intending to urinate on them—thus justifying Deputy Shepard's use of force—a reasonable jury could conclude that Deputy Shepard did not kick the tray slot "in a good faith effort to maintain or restore discipline" but instead harbored "ulterior motives." *Falco*, 345 F. Supp. 3d at 367. Specifically, under Barrett's version, Deputy Shepard was taunting Barrett while he was being pepper sprayed. Once Barrett had disrobed, Barrett responded with what he alleges is commonly understood as a mere taunting gesture. Barrett asserts that he was not acting in a manner that would have caused officers to believe that he was intending to urinate on them. Deputy Shepard then kicked the tray slot closed and injured Barrett's thumb.

Thus, taking Barrett's version of events as true, Deputy Shepard taunted Barrett, and when Barrett respond with a taunt of his own, Deputy Shepard kicked the tray slot closed on Barrett's thumb, even though (1) Barrett's gesture could not have reasonably been viewed as an attempt to urinate on the officers, and (2) closing the tray slot would not have otherwise quelled Barrett's outburst. On this basis, a reasonable jury could infer that, contrary to his testimony, Deputy Shepard acted maliciously and sadistically to cause harm and had not used force to restore discipline. Likewise, a reasonable jury could find that the forced used and the injuries incurred were more than *de minimis*. *See Hudson*, 503 U.S. at 10 (stating that blows causing "bruises, swelling, loosened teeth, and a cracked dental plate, are not *de minimis* for Eighth Amendment purposes"). Therefore, summary judgment is not appropriate on this claim.

Accordingly, summary judgment is denied on the excessive-force claim with respect to Deputy Shepard. The remaining defendants are entitled to summary judgment, and the claim is dismissed to that extent.

## IV.    Qualified Immunity

The County Defendants argue that they are entitled to qualified immunity on all § 1983 claims because the rights at issue in this case were not clearly established. As to the claim for deliberate indifference to Barrett's mental-health needs, the County Defendants argue that there "is no precedent . . . that [when] an inmate with a history of disciplinary incidents engages in . . . disruptive and self-injurious behavior . . . [he] should be placed on constant watch because the inmate might attempt to take his or her life at some point." ECF No. 76-10 at 38. As to the excessive-force claim, the County Defendants assert there is "no precedent that . . . it is unlawful to close a food tray slot on an inmate who, while going berserk inside his cell and refusing to comply with orders, sticks his genitals through his food tray slot when officers are standing directly

outside the cell door . . . [and] reasonably perceive the inmate is going to attempt to urinate on them." *Id.* at 38-39. The Court is not persuaded.

"Public officials enjoy qualified immunity from suit for damages under 42 U.S.C. § 1983 for acts undertaken in their official capacity, unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known." *Phillips v. Wright*, 553 F. App'x 16, 17 (2d Cir. 2014) (summary order). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Id.* A right is clearly established if "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Thon v. Grimshaw*, No. 13-cv-898, 2016 WL 8671925, at *10 (N.D.N.Y. Aug. 26, 2016).

The right to be free from deliberate indifference to one's serious medical needs, including mental-health needs, is well established. *See Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care. It . . . must be provided to prisoners."); *Randle v. Alexander*, 170 F. Supp. 3d 580, 596-97 (S.D.N.Y. 2016). The County Defendants' argument that there is no precedent directly capturing the events at issue "conflates whether a right is clearly established with whether a defendant is liable in a particular case." *Randle*, 170 F. Supp. 3d at 596; *see also Estate of Clark v. Walker*, 865 F.3d 544, 552-53 (7th Cir. 2017) (rejecting similar argument). Barrett asserts that Nurse Schinski, Deputy Chief Yasso, and Corporal Newton took no action despite knowing that he had a pressing mental health need for which he sought assistance. If a

jury accepts Barrett's factual claims, such conduct would violate clearly established law, insofar as no reasonable official could believe that it would be constitutionally permissible to knowingly refuse to take any responsive measures where there is an acute risk that an inmate will attempt suicide. The County Defendants cite no authority to the contrary.

Similarly, "it is indisputable that freedom from the use of excessive force [under the Eighth Amendment] is a clearly established constitutional right." *Taylor v. Wilde*, No. 11-cv-3608, 2012 WL 2860999, at *4 (E.D.N.Y. July 10, 2012) (internal brackets omitted). It is also clear that "excessive force is defined as force not applied in a good-faith effort to maintain or restore discipline." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999). If a jury accepts Barrett's allegations, they could reasonably find that Deputy Shepard's conduct was not applied in good faith to protect officers or otherwise quell Barrett's outburst, but was instead a malicious use of force intended to cause harm. Such conduct is clearly unconstitutional. *See id.* ("[C]ertain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations *per se*.").

Therefore, given the factual disputes, the Court declines to grant summary judgment on any of the claims based on qualified immunity.

## V. Negligence

Barrett alleges that Sheriff Dougherty is liable for negligence in light of the "injuries[] and damages" sustained as a result of the incidents underlying his other claims. ECF No. 49 ¶ 108. In support, Barrett cites New York Correction Law § 500–c(4), which provides that a county sheriff "shall receive and safely keep in the county jail of his county each person lawfully committed to his custody." The County Defendants argue that this claim should be dismissed because "there is no evidence that Sheriff Dougherty was personally involved in any of the incidents at issue, let

alone that he acted negligently and that his actions were a proximate cause of [Barrett's] alleged injuries." ECF No. 76-10 at 40.

A claim for negligence under New York law consists of three elements: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Am. Ins. Co. v. City of Jamestown*, 914 F. Supp. 2d 377, 386 (W.D.N.Y. 2012). "[P]ursuant to Correction Law § 500–c, the Sheriff has a nondelegable duty to keep prisoners in the county jails safe." *Kemp v. Waldron*, 115 A.D.2d 869, 870-71 (N.Y. App. Div. 1985). This duty includes a responsibility to "make *necessary* medical care available" to inmates. *Bowers v. Essex Cnty.*, 461 N.Y.S.2d 959, 961 (App. Div. 1983); *see also Andrews v. Cnty. of Cayuga*, 947 N.Y.S.2d 698, 699 (App. Div. 2012). However, a sheriff cannot "be held vicariously liable for the tortious conduct of corrections officers arising out of their performance of a criminal justice function." *Burke v. Warren Cnty. Sheriff's Dep't*, 890 F. Supp. 133, 139 (N.D.N.Y. 1995). A sheriff may only be held liable "for his own negligence." *Id.*

Barrett marshals no evidence to demonstrate that Sheriff Dougherty was personally involved, let alone negligent, with respect to the suicide attempt or the excessive-force incident. Therefore, Barrett cannot maintain a negligence claim on the basis of either of those incidents. *See id.* at 139-40.

The only allegations that involve Sheriff Dougherty personally are those concerning Barrett's knee condition. Barrett alleges that in early May 2014, he met with Chief Deputy Yasso and Sheriff Dougherty to discuss his knee problems. At that time, Barrett requested a knee brace and asked to see a specialist or obtain an MRI or X-ray. It was not until approximately two weeks later—May 22, 2014—that Dr. Aguirre was again contacted regarding Barrett's knee problems. Dr. Aguirre declined to provide a knee brace at that time because he wanted to review Dr.

Capecci's notes, which he did approximately one week later. Barrett was given a knee brace in mid-June.

With respect to his knee condition, Barrett's negligence claim is insufficient to survive summary judgment. The Court recognizes that jail authorities have a duty to provide adequate medical services "without undue delay." *Marchione v. State*, 194 A.D.2d 851, 855 (N.Y. App. Div. 1993). But Barrett has failed to adequately explain how any delay that could be attributed to Sheriff Dougherty was a "proximate or aggravating cause of [his] claimed injur[ies]." *Id.* Sheriff Dougherty became personally involved in the events surrounding Barrett's knee treatment in early May, so it would seem that the only delay that could be attributed to him would be somewhere between a few weeks to one-and-one-half months. The problem is that Barrett does not cite any evidence to connect *that specific delay* to his injuries.

For example, Barrett does not provide evidence to show that the delay attributable to Sheriff Dougherty was a proximate cause of his ACL injury. Indeed, Barrett's medical expert, Dr. Tebor, testified at his deposition that he could not "be positive" that Barrett even suffered an acute ACL or MCL tear while at the Livingston County Jail. ECF No. 76-7 at 54. Likewise, although Dr. Tebor opines generally that the "*long term delay* in appropriate treatment and bracing" while at the jail will likely cause Barrett to develop degenerative arthritis, he does not specifically posit that the delay encompassing the short period during which Sheriff Dougherty was involved proximately caused or materially increased the likelihood of degenerative arthritis. ECF No. 76-6 at 60 (emphasis added). In short, absent a more clearly defined theory against Sheriff Dougherty, supported by record evidence, Barrett has not presented a sufficient negligence claim. *See Marchione*, 194 A.D.2d at 855 (where inmate alleged that negligent delay in treatment caused impotence, he was required to show that "there was a 'substantial possibility' that his impotence

was caused by a delay in treatment by the State and that the State's negligence deprived claimant of an appreciable chance of avoiding the loss suffered").

Therefore, Sheriff Dougherty is entitled to summary judgment on the negligence claim.

**CONCLUSION**

For the reasons discussed above, Dr. Aguirre's motion for summary judgment (ECF No. 71) is GRANTED. The County Defendants' motion for summary judgment (ECF No. 76) is GRANTED IN PART and DENIED IN PART. The County Defendants are entitled to summary judgment on all but the following claims:

(1) The § 1983 claim against Nurse Schinski, Corporal Newton, and Chief Deputy Yasso for deliberate indifference to Barrett's mental-health needs;

(2) The § 1983 claim against Nurse Schinski, Corporal Newton, and Chief Deputy Yasso for failing to protect Barrett from the risk of suicide; and

(3) The § 1983 claim against Deputy Shepard for excessive force.

Those three sets of claims survive summary judgment and will proceed. The Clerk of Court is directed to dismiss Livingston County, Sheriff Thomas J. Dougherty, Gail Yunker, Heather Braaten, and Dr. Richard F. Aguirre from this action. By separate order, the Court will schedule a status conference to hear from the parties on the progress of this action.

IT IS SO ORDERED.

Dated: March 7, 2019
Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court